UNITED STATES of America ex rel.
Jeffrey FOSTER,
Petitioner-Appellant.

v.

James R. SCHLESINGER, Secretary of
Defense, et al.,
Respondents-Appellees.

No. 623, Docket 74–2275.

United States Court of Appeals,
Second Circuit.

Argued Feb. 26, 1975.

Decided July 21, 1975.

Daniel Riesel, New York City, for petitioner-appellant.

Louis G. Corsi, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., for the Southern District of New York, and Gerald A. Rosenberg, Asst. U. S. Atty., on the brief), for respondents-appellees.

Before LUMBARD, OAKES and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

Jeffrey Foster, a psychiatrist who holds the rank of Lieutenant in the

United States Naval Reserve, appeals from an order of the District Court for the Southern District, Kevin T. Duffy, J., denying his petition for a writ of habeas corpus and for an honorable discharge, as a conscientious objector, from the United States Naval Reserve. We reverse.

## I. Background.

In February 1966, while completing his premedical studies at Columbia University, Foster enrolled in the Navy's "Ensign 1915" Program for medical students, pursuant to which he received a military deferment enabling him to complete four years of medical school and a one-year internship prior to induction into active military service. As part of the program, Foster accepted an appointment as an ensign in the Medical Corps, Naval Reserve, beginning in September 1966 and agreed to serve twenty-four months on active duty if called by the Secretary of the Navy subsequent to his medical training.

In 1971, after graduating from New York Medical College and serving as a medical intern at the Metropolitan Hospital Center in New York, Foster applied for and received a further deferment under the Navy's "Berry Plan." This deferment would enable him to complete a three-year residency at Mount Sinai Hospital in New York as a psychiatrist.

Under neither the Ensign 1915 Program nor the Berry Plan did Foster receive any pay or tuition assistance, perform any activities normally associated with commissioned service in the Navy, or even don a uniform at any time. He did answer questionnaires sent by the Navy to determine his continued eligibility for a deferment. He also accepted several promotions and was made a Lieutenant on January 29, 1971.

By letter dated September 18, 1973, when Foster's Berry Plan deferment appears to have expired because of completion of his residency earlier than expect-ed, Foster sought to resign from the Naval Reserve as a conscientious objector. He stated that the basis for offering his resignation was his "long-evolving and strongly-held moral and ethical objection to war in all its forms." His beliefs, he wrote, had "solidified " recently to the point where he was no longer able to serve in the military in any capacity.

When the Navy rejected Foster's offer of resignation on March 4, 1974, Foster made a formal application for discharge as a conscientious objector. In support thereof, he submitted a detailed statement of his beliefs. Foster described his beliefs in nonviolence as part of an "ethical code" derived from an "awareness of the remarkable biological uniqueness we have been endowed with." He was not sure whether his early religious training [1] had influenced his beliefs, but he noted that he had not been a member of any religious organization for many years. He described the development of his beliefs as a search for "fundamental and unifying biologic themes" that could shed light on questions such as "why [man] makes the decisions he does." He saw violence, at the individual or national level, as "the most extreme violation of [the] basic moral directive" that men should not "retard or destroy [their] individual or combined functional integrity and potential capacities. . . ." Foster traced the evolution of his beliefs from his premedical studies at Columbia through his psychiatric residency.

Foster was married in the mid-sixties and has a son who was born in 1969. Along with his wife, Foster participated in peaceful anti-war rallies and campaigns during the Viet Nam war, but in describing in his request for discharge how his beliefs in nonviolence had strengthened, Foster continually referred to his experiences in the practice of medicine. For example, he referred to his experience the past sixteen months working part-time in a methadone clinic. "The treatment of such people," he said,

---

1. Foster wrote that he had regularly attended Sunday School at a reform synagogue until his early teenage years.

"has emphatically shown me that violent behavior is always an abortive, emotionally primitive attempt at problem-solving and communication." He was convinced that war among nations could not be condoned, "any more than violence [can] be supported or encouraged among patients." Foster felt he could not serve in the military, even as a doctor, since he felt that the military's view of a doctor's function was to make ill men combat-ready. Foster viewed his role as a psychiatrist as aimed in part towards directing man's tendencies away from violence.

Foster wrote that his decision to seek a discharge had followed a period of intense introspection in August and September, 1973, which had been prompted by two events. First, he had received a letter from one Captain Trone of the Navy, stating that Foster had not filed the requisite form to continue his Berry Plan deferment, and that unless such a form was filed within ten days, Foster would be called immediately to active duty. The Captain's letter allegedly made Foster think seriously about the active duty to which he had committed himself. In the same period, Foster had been treating a twenty-year old woman who knew she was dying of leukemia. Foster stated that "From treating this woman in particular,—as well as from later work with other dying patients . . .—I learned by painful personal experience a final repugnance for any unnecessary, man-made cause of death such as war implicitly involves."

Accompanying his statement of beliefs, Foster submitted letters from his wife, several friends, and Dr. Joel Markowitz, a psychiatrist whom Foster had known and visited for fourteen years.

These letters attested to the strength of Foster's convictions and to his self-examination in August and September 1973 as to whether he should seek discharge as a conscientious objector from the Naval Reserve.

Pursuant to Navy regulations for processing Foster's application for discharge, Foster was interviewed by a Navy psychiatrist, Dr. Thomasson, and then a Navy chaplain, Commander A. J. Otto. 32 C.F.R. §§ 730.18(g), (h) (1974). Dr. Thomasson found no psychiatric disorders warranting treatment or disposition through medical channels. Commander Otto found Foster "weakly sincere in his convictions that he can never participate in any act of war." He also described Foster's conscientious objector claim as "based upon a rare personal moral code, which even he has trouble in defining."

A hearing[2] was held before the investigating officer assigned to the case, Commander J. C. Sweeney,[3] on May 31, 1974. Foster was represented by retained counsel. Dr. Markowitz testified at length. He stated in part that Foster had anti-war beliefs prior to his enlistment in 1966 in the Ensign 1915 Program. He also said that at some time Foster had mentioned that "he was supposed to go in the Navy but there was some alternative and I don't think he ever considered himself in the Navy from that time until this very time. He just pushed it out of his mind."[4] Markowitz testified that he thought the prospect of activation had crystallized Foster's views in 1973, and that had Foster been presented with this situation earlier, something similar would have happened. Foster also testified, elaborating upon and explaining matters dis-

2. See 32 C.F.R. § 730.18(j).

3. Commander Sweeney was a member of the Naval Reserve and a Professor of Law at Fordham University.

4. Although the government would place this incident in 1966, when Foster was considering enrolling in the Ensign 1915 Program, Foster asserts in his reply brief that Markowitz was referring to an event in 1971. The "alternative" referred to in the testimony, Foster states, was a continued deferment under the Berry Plan. It seems likely that the incident did occur in 1971, because Markowitz testified that Foster mentioned that "he was supposed to go in the *Navy* . . . ." (Emphasis added) In 1966, prior to enlistment, Foster was subject to a general draft and there would have been no reason for him to refer specifically to the Navy.

cussed at length in his application for discharge.

Commander Sweeney issued a very brief report, based upon the entire record on June 21, 1974. He stated, without elaboration, that "the minimum objective standards now established by law and regulation for conscientious objector discharge have been met." He gave his opinion that Foster sincerely held ethical beliefs which require him to refrain from participation in any war at any time. Finally, he recommended that Foster be discharged as a conscientious objector.

On July 11, 1974, the Chief of Naval Personnel denied by letter Foster's request for discharge.[5] The decision was based on Navy regulation 32 C.F.R. § 730.18(b), which provides that a serviceman's claim of conscientious objection shall not be considered if the basis for that objection existed prior to enlistment and would have satisfied the requirements of 50 U.S.C. App. 456(j) and related provisions of law, but such objection was not claimed by the applicant prior to enlistment.[6] The Chief of Naval Personnel wrote that it was apparent from the testimony of Dr. Markowitz that prior to entry into the Navy, Foster was opposed to war and killing. He also referred to a statement by Dr. Markowitz that Foster's nonviolent attitudes had not in any way been modified in the last fourteen years. Finally, the Chief of Naval Personnel stated that "[w]hile your concerns and reservations may now be stronger there is nothing to indicate that your present beliefs are in substance and foundation any different than those you held before you accepted your commission."

Foster, who was now scheduled to report for active duty, filed a petition for a writ of habeas corpus in the Southern District. His call to active duty was stayed temporarily. On September 13, 1974, Judge Duffy denied the petition. Judge Duffy found that the government did not question Foster's sincerity or the depth of his convictions, and that the key factual determination made by the Navy was the time at which Foster's nonviolent beliefs had sufficiently developed to qualify him as a conscientious objector. Judge Duffy found that there was a basis in fact to support the decision of the Chief of Naval Personnel that Foster's conscientious objection had crystallized prior to enlistment in the military.

Following the district court's denial of Foster's petition, Foster moved to stay his call to active duty pending disposition of his appeal. This motion, which the respondents did not oppose, was granted by the district court.

---

5. The record had first been forwarded to Foster's commanding officer (pursuant to 32 C.F.R. § 730.18(k), who in turn forwarded the file to the Chief of Naval Personnel. The commanding officer, contrary to Navy regulation 32 C.F.R. § 730.18(k) (1974), failed to make any recommendation as to Foster's application. However, Foster's commanding officer did not know Foster personally, as Foster's contacts with the Navy had been extremely limited, and this may explain his failure to make any recommendation.

6. 32 C.F.R. § 730.18(b) (1974) provides:

(b) After entering naval service, a request for discharge based solely on conscientious objection which existed but was not claimed prior to induction or enlistment shall not be considered if such beliefs satisfied the requirements for classification as a conscien-

tious objector pursuant to section 6(j) of the Universal Military Training and Service Act, as amended (50 U.S.C. App. 456) and related provisions of law, and the member failed to request classification as a conscientious objector by the Selective Service System (SSS), or if his request for classification as a conscientious objector before entering military service was denied on the merits by the SSS and his present request for classification as a conscientious objector is based on essentially the same grounds, or supported by essentially the same evidence, as the request which was denied by the SSS. Claims growing out of the experience prior to entering military service but which did not become fixed until after entry into the service will be considered.

## II.

■ Foster argues initially that there was no basis in fact to support the finding by the Chief of Naval Personnel that Foster's objection to serving as a doctor in the military had crystallized prior to enlistment in 1966. Under 32 C.F.R. § 730.18(b), such pre-enlistment crystallization is a ground for denying an otherwise valid application for conscientious objector classification and discharge. The determination of when a person's beliefs become "fixed" within the meaning of the regulation is a finding of fact, to be made in the first instance by the military. Judicial review of such findings in conscientious objector cases is limited to a determination of whether there is a "basis in fact" to support them. The "basis in fact" test is satisfied if there is objective evidence, even though not preponderant or substantial, to support the finding in question. *Nurnberg v. Froehlke,* 489 F.2d 843 (2d Cir. 1973); *United States ex rel. Checkman v. Laird,* 469 F.2d 773, 778 (2d Cir. 1972).

The first reason given by the Chief of Naval Personnel to support his finding of pre-enlistment crystallization was that it was "apparent from the testimony of [Foster's] psychiatrist that prior to entry into the Navy [Foster was] opposed to war and killing." It is clear, however, that a person may be "opposed to war and killing," but still not be conscientiously opposed to service in the noncombatant, healing capacity of a doctor. It was, of course, as a doctor that Foster could expect to serve following completion of his studies and expiration of his deferments under first the Ensign 1915 Program and later the Berry Plan. Had Foster applied for exemption from military service in 1966, the Selective Service Board would have focused closely on whether Foster's opposition to war and killing would have precluded service as a noncombatant, as well as a combatant. In the present case, where the issue is whether Foster's opposition to military service as a doctor became fixed prior to enlistment in the Ensign 1915 Program, a finding of pre-enlistment crystallization must be based on facts which tend to show not only that the applicant, at the time of his enlistment, was "opposed to war and killing," but that he was in addition opposed to serving in the Navy even as a doctor.[7]

The Chief of Naval Personnel pointed to a specific portion of the transcript of Dr. Markowitz's testimony to support the finding of pre-enlistment crystallization. In denying Foster's application he wrote that Foster's psychiatrist "stated that [Foster's] nonviolent attitudes haven't in any way been modified within the past 14 years." Thus, according to the excerpted testimony, Foster would have had the same objection in 1966 to serving as a doctor as he was relying upon in 1973–74. This testimony, however, was taken out of context. Just before the quoted passage, Markowitz had said that he (Markowitz) was not a conscientious objector, that he favored a militarily strong America, and that he had been willing to see his own son serve in Viet Nam. He then stated:

> It is part of an indication of the strength of Dr. Foster's beliefs that in 14 years of psychotherapy this hasn't in any way rubbed off on him. He hasn't in any way modified his nonviolent beliefs. (App. at 68a.)

Markowitz appears to have meant by this statement that Foster's antiwar beliefs had not weakened over the course of their association. Markowitz was not focusing here on how or whether Foster's nonviolent views might have

---

7. In 1966 Foster's position to war and killing may well have made him opposed to serving as a combatant in the military. He thus may have been eligible for the classification I-A-O as a conscientious objector whose views permit military service in a noncombatant status. It might be argued that his failure to apply even for that conscientious objector classifica-

tion could trigger the waiver provision of 32 C.F.R. § 730.18(b). However, we believe that this failure is not relevant where Foster enlisted in the capacity of a prospective doctor, a noncombatant, and where he has never been required to do anything in the military reserves of a combatant nature.

strengthened and developed over fourteen years.

The weakness of the government's argument that Foster's opposition to service as a doctor became fixed prior to enlistment can be seen by contrasting the evidence here with that relied upon by the Army, and by this court, in *Nurnberg v. Froehlke*, 489 F.2d 843 (2d Cir. 1973). In *Nurnberg*, this court found a basis in fact to support the Army's findings that a doctor's opposition to service had crystallized prior to enlistment and that the doctor had hidden his true beliefs when he enlisted under the Berry Plan. In *Nurnberg*, for example, only two years had passed between the doctor's enlistment in the Berry Plan during his internship and the filing of his application for discharge in 1969. Here over seven years had passed. In *Nurnberg* the applicant pointed to no event or experience during his Berry Plan shelter period which had triggered a crystallization, strongly suggesting that his C.O. status had blossomed before enlistment. Here Foster pointed not only to a period of self-examination triggered in August 1973 by treatment of the young woman dying of leukemia and by the letter from Captain Trone, but to a number of experiences and associations—primarily related to his medical training and practice—over a seven-year period which contributed to the strengthening of his beliefs and his decision in 1973 to seek discharge as a conscientious objector. Furthermore, in the present case, Foster enrolled in the Berry Plan in February 1966 during the very period to which he traced the beginning of the development of his present beliefs—the year prior to his entry into medical school in September 1966. There is every reason to believe that his views at that time were still very much in the process of development. Nurnberg, on the other hand, had a father and grandfather who were both conscientious objectors, and his mother had stated that "he was brought up by his parents as being opposed to the military and to stick to his beliefs and conscience." Nurnberg's mother had also testified that her son had been upset since 1961 when he registered for the draft because "he cannot possibly serve in the military." Finally, in *Nurnberg* the investigating officer said he could only conclude that the applicant's objection developed and existed prior to enlistment. Such findings by an investigating officer, who personally interviews the applicant, while not binding on the Chief of Naval Personnel, carry significant weight.

In Foster's case, the investigating officer, Commander Sweeney, made no express finding with respect to crystallization. However, it seems most likely that Commander Sweeney's recommendation that Foster's application be granted contained an implied finding of post-enlistment crystallization. As the investigating officer, Commander Sweeney was supposed to be familiar with the applicable standards for discharge, stated he was here, and then questioned Foster and Markowitz as to the timing and development of Foster's beliefs. Even if Commander Sweeney's report is interpreted as containing no implied finding in Foster's favor, that still is in contrast to *Nurnberg* where the investigating officer made a finding adverse to the applicant.

The government nevertheless argues that portions of Markowitz's testimony, not specifically referred to by the Chief of Naval Personnel, demonstrate that Foster realized prior to enlistment that serving in the Navy even as a doctor was incompatible with his beliefs. We disagree. Markowitz testified that it was only in August 1973 that Foster finally confronted the question of whether he could serve in the Navy as a doctor. Markowtiz, as well as Foster, Foster's wife, and Kenneth Gordon, an attorney and friend who submitted a letter on Foster's behalf, all commented on the intense period of self-examination Foster underwent in August 1973 with respect to service in the Navy. This is hardly indicative of a man who allegedly made up his mind as early as 1966 that he could not serve. The government refers to Markowitz's testimony that Foster

seemed to use a psychological device called "denial" in keeping the Navy out of his mind prior to August 1973. Markowitz further suggested that he had a "feeling" that any time Foster had been presented with this situation, "something like this would have happened." Yet even accepting this "feeling" as true,[8] this still does not show that Foster "hid" from the Navy upon enlistment a belief that he could not serve as a doctor if called, as the doctor was found to have done in *Nurnberg*. Markowitz's testimony indicates that Foster had not resolved the problem in his own mind at the time of enlistment.

■ Is Foster to be held to have waived any claim to discharge as a conscientious objector merely because evidence suggests that in 1966 he left unresolved doubts he may have had as to whether he could serve in the Navy as a doctor, if later called? We think not. To support a decision under 32 C.F.R. § 730.18(b) that a person waived a conscientious objection claim by failing to raise it upon enlistment, there must be some objective evidence supporting the conclusion that the applicant, upon enlistment, in fact recognized that if he was ever called to duty, his present beliefs would require him to object on the ground of conscientious objection. The regulation states that:

> "[c]laims growing out of experiences prior to entering military service but which did not become fixed until after entry into the service will be considered." 32 C.F.R. § 730.18(b) (1974).

At least in a case where a person gains so little from enlistment in the Ensign 1915 Program or the Berry Plan other than a deferment—Foster for example, received no pay or tuition assistance—it seems most reasonable to interpret 32 C.F.R. § 730.18(b) as authorizing a finding of waiver only where a person realized upon enlistment that his beliefs would not permit him to serve if called.

8. There is substantial question whether Markowitz was referring as far back as 1966, as this statement was made in response to a

In the present case we conclude that there was no basis in fact to support the determination of the Chief of Naval Personnel that Foster's objection to serving as a doctor became "fixed" prior to enlistment in the Ensign 1915 Program.

### III.

Foster also argues that even assuming that his objection to serving as a doctor had crystallized prior to enlistment, the waiver provision of 32 C.F.R. § 730.18(b) does not apply to his claim. Under 32 C.F.R. § 730.18(b), a waiver will only be found if the applicant's beliefs, at the time of enlistment, "satisfied the requirements for classification as a conscientious objector pursuant to section 6(j) of the Universal Military Service and Training Act, as amended 50 U.S.C. App. 456 and related provisions of law. . ." Foster contends that in 1966, as today, his beliefs in nonviolence were ethical and moral, and not "religious" or the result of religious training. He argues that prior to *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), these moral and ethical beliefs would not have been considered a sufficient basis for classification as a conscientious objector.

Section 6(j) provided in 1966 that a person would be excused from service in the armed forces if, "by reason of religious training and belief," he was "conscientiously opposed to participation in war in any form." Section 6(j) at that time defined the term "religious training and belief" to mean

> an individual's belief in relation to a Supreme Being, involving duties superior to those arising from any human relation, but [not including] essentially political, sociological, or philosophical views or a merely personal moral code.

In 1965 the Supreme Court, in *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733, interpreted section 6(j) and the requirement that an individual's "religious training and belief" be in

question whether anything in the last year had made it impossible for Foster to serve in the armed forces.

"relation to a Supreme Being." The Court stated that "Congress, in using the expression 'Supreme Being' rather than the designation 'God,' was merely clarifying the meaning of religious training and belief so as to embrace all religions and to exclude essentially political, sociological or philosophical views." *Id.* at 165, 85 S.Ct. at 854. The Court established an objective test, "namely, does the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for the exemption." *Id.* at 184, 85 S.Ct. at 863.[9]

In 1970, in *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308, the Court again interpreted section 6(j). A plurality (four justices) stated that the case was controlled by *Seeger* and restated the requirements for conscientious objection as follows:

> If an individual deeply and sincerely holds beliefs that are *purely ethical or moral* in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by  .  .  .  God' in traditionally religious persons.  Because his beliefs function as a religion in his life, such an individual is as much entitled to a 'religious' conscientious objector exemption under § 6(j) as is someone who derives his conscientious opposition to war from traditional religious convictions.  *Id.* at 340, 90 S.Ct. at 1796.  (emphasis added).

Mr. Justice Harlan concurred in the result on constitutional grounds only. While he had concurred in *Seeger,* which had largely removed the theistic requirement of section 6(j), he described the plurality opinion in *Welsh* as performing a "lobotomy" on the statute by reading out any distinction between religiously acquired beliefs and "essentially political, sociological or philosophical views or a merely personal moral code." *Id.* at 351, 90 S.Ct. at 1802. While he found such a distinction to be unconstitutional, he found that it had been intended by Congress.[10]

It is the government's position that, as the plurality in *Welsh* suggested, the Court in *Welsh* was merely applying *Seeger* and was not extending the class of persons eligible for classification as conscientious objector beyond what had been done in *Seeger.* Foster, however, argues that prior to *Welsh,* a moral or ethical code such as his would not have qualified under the interpretation given section 6(j) and *Seeger* by the Selective Service System, the Navy itself, and a number of federal courts.

In support of his argument, Foster cites *United States v. Fargnoli,* 458 F.2d 1237 (1st Cir. 1971), in which the First Circuit found that *Welsh* constituted a dramatic change for those whose beliefs were not "religious" or the product of religious training. The court noted that prior to *Welsh,* the Selective Service System took the position that "the use of the word [religion] in connection with the selective service law *was not intended to be inclusive of morals,* or of devotion to human welfare or of policy of

---

**9.** In 1967 Congress amended the definition of "religious training and belief" in section 6(j) by deleting the reference to a Supreme Being. In relevant part this section now provides:

> As used in this subsection, the term "religious training and belief" does not include essentially political, sociological, or philosophical views, or a merely personal moral code.

50 U.S.C. App. § 456 (1970).

**10.** Mr. Justice White (joined by the Chief Justice and Mr. Justice Stewart) dissented on the

ground that the decision was an extension of the draft exemption to those "who disclaim religious objections to war and whose views about war represent a purely personal code arising not from religious training and belief as the statute requires but from readings in philosophy, history, and sociology." 398 U.S. at 367, 90 S.Ct. at 1811. They agreed with Mr. Justice Harlan that Congress had intended to draw such a distinction, but they concluded that such a distinction was constitutional.

government . . . ." L. Hershey, D. Omer & E. Denny, Legal Aspects of Selective Service 12 (1969 ed.) (manual for government appeal agents) (emphasis added). After *Welsh* the Selective Service System issued a memorandum (Local Board Memorandum 107) stating in part:

> The term "religious training and belief" as used in the law may include solely moral or ethical beliefs, even though the registrant himself may not characterize these beliefs as "religious" in the traditional sense, or may expressly characterize them as not "religious."

The First Circuit found that however a court might view the progression from *Seeger* to *Welsh*, a local board could not fail to recognize a significant change in the guidelines.

The Navy regulations themselves suggest that the Navy viewed *Welsh* as constituting a further extension of section 6(j). In 1969, prior to *Welsh*, 32 C.F.R. § 1622.14 provided as follows:

> In Class I-O shall be placed every registrant who would have been classified in Class I-A but for the fact that he has been found, *by reason of religious training and belief*, to be conscientiously opposed to participation in war in any form . . . .

In December 1971, following *Welsh*, this provision was amended by deleting the phrase "by reason of religious training and belief." 32 C.F.R. § 1622.14 (1972). Once again, such a change was not without significance to military officers applying the regulations to applicants for discharge. The term "religious training and belief" has been reintroduced into current Navy regulations, but the term is now expressly defined to include "deeply held moral or ethical belief . . . ." 32 C.F.R. § 730.18(b)(2) (1974).

Finally, a number of cases decided by courts of appeals prior to *Welsh* suggest that many courts and local boards had treated moral and ethical beliefs, without a basis in religious training, as not

satisfying the requirements of section 6(j), as interpreted in *Seeger*. *See, e. g., Morico v. United States*, 399 U.S. 526, 90 S.Ct. 2230, 26 L.Ed.2d 776 (1970), *vacating and remanding in light of Welsh the following cases: United States v. Morico*, 415 F.2d 138 (2d Cir. 1969); *Vaughn v. United States*, 404 F.2d 586 (8th Cir. 1968); *United States v. McQueary*, 408 F.2d 493 (9th Cir. 1969); *Callison v. United States*, 413 F.2d 133 (9th Cir. 1969). *See also Welsh v. United States*, 404 F.2d 1078, 1081 (9th Cir. 1968), *rev'd*, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970). It was only in *Welsh* that the Court clearly limited section 6(j)'s exclusion of persons with "essentially political, sociological or philosophical views or a merely personal code" primarily to (1) those whose beliefs are not deeply held and (2) "those whose objection to war does not rest at all upon moral, ethical, or religious principle but instead rests solely upon considerations of policy, pragmatism or expediency." 398 U.S. at 342–43, 90 S.Ct. at 1798. Prior to *Welsh* courts and boards attempted to give greater meaning to the distinction drawn in the statute between "religious training and belief" and essentially sociological or philosophical views, or merely a personal moral code.

■ We conclude that with respect to an applicant whose objection to military service was based primarily on moral or ethical grounds, *Welsh* indeed marked a dramatic change. Although it is arguable that such a person in 1966 might have realized from *Seeger* that conscientious objection based on moral or ethical views might eventually be upheld (as in *Welsh*), it seems appropriate to construe the Navy waiver regulation (32 C.F.R. § 730.18(b) ) in light of the views of the Navy itself, the Selective Service System, and many lower federal courts prior to *Welsh*. As these officials interpreted *Seeger*, purely moral or ethical views would not have qualified a person for conscientious objector classification and discharge prior to *Welsh*.[11]

---

11. The government relies on several cases for the proposition that *Welsh* did not constitute

an extension of *Seeger*. See *United States v. Hoffman*, 488 F.2d 923 (5th Cir. 1974); *United*

The government argues that if *Welsh;* changed the application of section 6(j) by the Selective Service System, the Navy, and many federal courts, a determination of whether Foster would have been found by them to be a conscientious objector prior to *Welsh* should not be made on the present record, and the case should be remanded to the Navy for further factual development. We do not agree. While normally such a remand would be appropriate, this is not such a case. Foster's belief in nonviolence stems in part from his view that human beings have a special role in the world because they represent the furthest evolutionary advance. It also stems from his reaction to having a father who was a very violent man. "Religious" training seems to have played little, if any role, in the development of Foster's beliefs. Although Foster's application for discharge and the testimony at the hearing explored the nature and development of his beliefs in great detail, religious training was hardly mentioned.[12] The chaplain, after interviewing Foster, described Foster's belief as a "rare personal moral code, which even he has great trouble defining." Moreover, the investigating

States v. Sandoval, 475 F.2d 266 (10th Cir. 1973); *United States v. Gerin*, 464 F.2d 492 (9th Cir. 1972); *Gee v. United States*, 452 F.2d 849 (5th Cir. 1971).

These cases typically were appeals from convictions for failure to report for induction. In *Gee*, for example, the court stated that "although *Seeger* is not the model of clarity, we think it was certainly adequate to place Gee on notice that his claim of conscientious objection based on nonreligious [grounds] was not so foreclosed by the existing law as to compel a guilty plea." The proper course, the court said, would have been for Gee to report for induction and present his claim after induction through army channels.

To the extent that these cases may be inconsistent with the position we take here, we respectfully disagree with them.

officer stated that he was persuaded that Foster "sincerely holds *ethical* beliefs which require him to refrain from participation in any war at any time." App. at 94a (emphasis added). At one point Foster spoke of a "supreme force, a primary force which has evolved inanimate matter into stars . . . and into life . . ." but he characterized this force, as a "biological purpose," as one of "biologic selection, refinement and endowment occurring over millions of years." App. at 82a.

We are convinced on the basis of the detailed record below, that (assuming Foster's views had crystallized prior to enlistment in 1966) he would not have qualified as a conscientious objector under section 6(j) and *Seeger*, as interpreted by the Selective Service System, the Navy, and many courts in 1966. Accordingly, we find that the waiver provision of 32 C.F.R. § 730.18(b), does not bar consideration of Foster's claim in the present case.

The order of the district court is reversed. The district court is directed to grant the petition and issue the writ of habeas corpus.

12. In his application for discharge, Foster stated as follows:

*Development of Beliefs*
I am not sure if my early religious training has influenced the development of my beliefs. I have not been a member of any religious organization in many years and do not consider myself to be religious in any traditional sense. Yet the fact that I regularly attended Sunday School in a reform synagogue as a young child up until my early teenage years may have been influential nonetheless.
I do know, however, that the beginning of my beliefs concerning man's special biological endowment and momentum can be traced to the year prior to my entry into medical school . . . .