07-2563-pr
Watson v. Green

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: April 22, 2009                    Decided: June 25, 2009)

Docket No. 07-2563-pr

_____

TIMOTHY D. WATSON,

*Petitioner-Appellee*,

—v.—

PETE GEREN, SECRETARY OF THE ARMY,

*Respondent-Appellant*.

_____

B e f o r e :

MCLAUGHLIN, CALABRESI, and KATZMANN, *Circuit Judges*.
_____

Appeal from a judgment of the United States District Court for the Eastern District of

New York (Nina Gershon, *Judge*), granting Dr. Timothy Watson's petition for a writ of habeas

corpus in a case involving an application for discharge as a conscientious objector. We hold that,

in the ordinary course, where the Department of the Army Conscientious Objector Review Board

(the "DACORB") fails to state its reasons for denying an application for discharge as a

conscientious objector, remand to the Army for an adequate statement of reasons is appropriate.

However, remand would be futile, and is therefore not required, where there is no basis in fact to support the DACORB's decision. Because the record contains no basis in fact to support denial of Dr. Watson's application on any valid ground, we affirm the judgment of the district court.

————————————

RAYMOND J. TONEY, New York, NY, *for Petitioner-Appellee Timothy D. Watson*.

JOSHUA WALDMAN, Attorney, Appellate Staff, Civil Division, Department of Justice, Washington, DC (Anthony J. Steinmeyer, Attorney, Benton J. Campbell, United States Attorney for the Eastern District of New York, and Gregory G. Katsas, Acting Assistant Attorney General, *of counsel*), *for Respondent-Appellant*.

Arthur Eisenberg, Palyn Hung, and Deborah Karpatkin, New York, NY, and J.E. McNeil and Daniel O'Connor, Washington, DC, *for the Center on Conscience & War and the New York Civil Liberties Union as* amici curiae *in support of Petitioner-Appellee*.

————————————

KATZMANN, *Circuit Judge*:

We are called upon to review a matter involving a doctor's application for discharge from the Army as a conscientious objector. Respondent-Appellant Pete Geren, Secretary of the Army (hereinafter, "the Army"), appeals from a judgment of the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*), granting Petitioner-Appellee Dr. Timothy Watson's petition for a writ of habeas corpus. Watson applied for discharge from the Army as a conscientious objector. His application was denied by the Department of the Army Conscientious Objector Review Board (the "DACORB"). The district court held that the DACORB failed to provide an adequate statement of reasons to explain its decision and granted

2

the writ. On appeal, the Army does not challenge the district court's determination that the DACORB did not provide an adequate statement of reasons. Instead, it argues that the district court erred in refusing to remand the case to the DACORB. We hold that, in the ordinary course, where the DACORB fails to state its reasons for denying an application for discharge as a conscientious objector, remand to the DACORB for an adequate statement of reasons is appropriate. However, remand would be futile, and is therefore not required, where there is no basis in fact to support the DACORB's denial on any valid ground. In this case, as there is no basis in fact to support denial of Dr. Watson's application on any valid ground, we affirm the judgment of the district court.

## BACKGROUND

In 1998, while attending medical school at George Washington University, Timothy Watson applied for a scholarship under the United States Army Health Professions Scholarship Program. The Army offered to pay for Watson's remaining three years of medical school in exchange for Watson's commitment to serve three years of active duty after he completed his schooling. After graduating from medical school in 2001, Watson entered a one-year internship program in internal medicine and, afterwards, enrolled in a four-year civilian residency program in radiology. The Army deferred Watson's active duty obligation during this period to allow him to complete his internship and residency.

On January 3, 2006, during the last year of his residency, Watson applied for discharge as a conscientious objector, pursuant to Army Regulation 600-43. Because the contents of Watson's application are vital to our analysis of whether there was a basis in fact to support the

3

DACORB's decision, we include extensive excerpts from the application here.[1]

In response to a question requesting a description of the nature of the belief that required Watson to seek conscientious objector status, Watson wrote:

> I believe that warfare is immoral. I cannot participate in warfare or support warfare in any form. I cannot kill other human beings or assist those who do. My position stems from my moral, ethical and religious beliefs regarding the sanctity of human life, the power of non-violent resistance, and the role I have been called to play, and have chosen to play, in my journey through this precious and extraordinary life. I have given these issues profound thought over the past few years, and continue to give them profound thought, and my firm conclusion is that I cannot be a soldier. I cannot kill other human beings or assist those who do. I cannot support institutions that kill and make war. I prefer going to jail over killing or being part of an institution that kills. I prefer to die than to kill.
>
> Furthermore, as preparation for war and the conduct of warfare are the defining principles of military service and training, I no longer consider my work as a physician congruent with active participation in any military organization. I am morally opposed to participation in military activities of any kind. My work as a physician is in direct opposition to the purpose of all armed forces and the prospect of my future employment as a physician in the Army Medical Corps is utterly incompatible with my beliefs regarding war, justice and God.
>
> Participating in the care of injured active service members, thereby speeding their recovery and return to active military operations, results in the functional equivalent of weaponizing human beings. Because war is inherently inaccurate, collateral injuries to noncombatants are inevitable; my future participation in the Army would result in a perversion of my training and work as a doctor. In the Army, my work to heal would result, however indirectly, in the infliction of unnecessary wounds and loss of life. I cannot in good conscience justify these results, and will not voluntarily participate in them. . . .
>
> . . . .
>
> . . . As a physician now morally opposed to killing and war, my separation from the U.S. Army is essential to my ability to live life and face death with a clear conscience. I cannot willfully undertake any actions that will violate my conscience and deeply held moral, religious, and ethical beliefs. I am no soldier; and I am no longer a physician who will work for an institution of war.

Joint Appendix ("J.A.") 182-83.

---

[1] These excerpts are reproduced exactly as they appear in the Record, without any corrections.

Responding to a request regarding how his beliefs changed or developed, including what sources and training had caused the change, Watson stated:

> Over the past eight plus years of my medical training, more than seven years since the signing of my contract with the Army, the single unifying theme of all my academic and professional endeavors has been the improvement of individuals' health and well-being. The world and I both have since changed significantly from when I first entered this contractual relationship with the U.S. Army. As a form of retaliation and under the pretense of national security, the United States military has invaded and occupied a foreign country in an unprecedented pre-emptive war and I have become a doctor who now views war as an unacceptable lapse of reason, the ultimate act of futility and an entirely shameful human endeavor.
>
> The tragedy of September 11, 2001 and our subsequent response in Afghanistan and Iraq have been profound catalysts for introspection, and constitute a radical turning point in my life. These ongoing events have led me to reconsider many of my views on life, God, religion, government, politics, and ultimately my role as a human being here and now on this small planet.
>
> We live in a radically different world than we did before September 11, 2001 and our response with wars in Afghanistan and Iraq, and I am a changed person as a result. These ongoing wars, and the mass death and destruction resulting from them, have led me to more fully comprehend the immorality, cruelty and arbitrariness of violence in general, and particularly the futility of violent retaliation. They have led me to detest violence and reject it completely. These events, for me personally and my generation, are comparable to the massive loss of human life inflicted during the Vietnam War and its profound effect on the moral, ethical, and political beliefs of millions of young people at that time.
>
> A significant part of my response to these horrific events was to learn more about violence, the causes of violence, and alternatives to violence. They also caused me to search deeply within myself and to question my beliefs about life, death, warfare, violence and God.

J.A. 183-84.

Watson went on to explain the sources of non-violence he had studied, including Dr. Martin Luther King Jr., Mohandas Gandhi, the Dalai Lama, and others. He quoted from the Christian Bible, the Qur'an, the Rig Veda, and Dr. King. Watson commented that Eastern philosophies and writers, from Hinduism and Gandhi to Islam, Buddha, Confucius, and Lao-Tse, were also a source of great inspiration. According to Watson, in all of those sources, there was

no suggestion that war or killing was an answer or a solution. Instead,

> the use of violence is strikingly and consistently discredited as morally abject and spiritually void. Granted my study of the worlds great religions is relatively still in its infancy, but those leaders of men most widely admired and revered today overwhelmingly are not history's warmonger's but it's peacemakers. I choose to stand on the side of the peacemakers and will therefore not wear a military uniform ever again.

J.A. 185.

In conclusion, Watson explained that in addition to taking the time to read the Bible and research other religious texts, he joined and participated in peace organizations and marched in New York and Washington to stop the war in Iraq.

> . . . I do now know that warfare is immoral, unnecessary, and completely incompatible with my purpose in life. The military science of exerting violent force against another should be beneath us by now, an abominable and wretched last resort representing nothing more than a failure of reason and morality -- the unique qualities which most exemplify what it means to be human. With the overwhelming abundance of wealth in the world today, there are no rational arguments for war and I, as a being of freewill, refuse to participate in its practice at any level.

J.A. 186.

The next question required an explanation of when Watson's beliefs became incompatible with military service. Watson stated that his decision began to take form in late 2004 and crystallized by early Summer 2005.

Asked about the circumstances in which Watson believed the use of force was permissible, he responded:

> The use of violent force and warfare in the name of defense can quickly become a slippery slope leading to unnecessary harm and war for the sake of mindless revenge. I am not however a strict pacifist. I would forcibly defend my loved ones and myself against physical attack if need be, but not to inflict harm or extract retribution.

J.A. 186. Further, Watson explained that while he had no objections to the civilian police force,

6

he was morally opposed to the death penalty under any circumstances.

To a question asking what in Watson's life conspicuously demonstrated the consistency and depth of his beliefs, Watson responded that he set aside time each day for reflection (what others might call meditation and prayer), during which he committed himself to the goal of having his deeds express humble, selfless love and goodwill. He also viewed his application as a

> conspicuous act of selflessness and morally sound goodwill. I make my request for conscientious objector status, solemnly and with full understanding of the potential consequences I am opening myself to. I understand I may forfeit all future benefits from the Veterans Administration. I understand I will be required to remit all costs incurred by the US Army for my medical training. I understand that the relationships with my family and friends will continue to be tested because of my decision. I understand that I may be stigmatized by society at large for the rest of my life. I understand that I may be forced to choose between being a soldier and going to prison. And I certainly understand that being a military doctor for a few years is a far easier and more practical solution to this situation.
>
> Regardless, these consequences are outweighed by the prospect of the use of my skill and any of my effort in participation with an organization that is directly opposed to my beliefs. No matter the difficulties this decision may bring, I will not voluntarily work for the U.S. Army, nor any other branch of the United States military. Affiliating myself and my work as a physician with any institution of war is morally unacceptable to me and I refuse to do so simply to avoid personal hardships.

J.A. 188-89.

Finally, in response to a question regarding how his daily life and future plans had changed as a result of his beliefs, Watson stated that his goal to lead a life based on love and goodwill had made him more introspective, more curious and more questioning. "I now think much more about how my individual choices, actions and inactions, may impact others and while this has made me more courteous, polite, solemn and quiet, it has also made me more questioning, skeptical, demanding and resolute." J.A. 189. Watson described that he had participated in a march on Washington D.C. organized by United for Peace and Justice and Act

7

Now to Stop War and End Racism, and joined Physicians for Social Responsibility, an organization focused on nuclear disarmament, gun control, and environmental issues. His professional goals changed as well--he decided to pursue a career in oncology imaging and intervention, a psychologically and physically demanding area of radiology in which he hoped to fulfill his responsibility to help others. Watson also explained that he would strive to teach his son religious tolerance, and would expose him, at an early age, to the heroes it had taken him his entire life to discover. Watson then included quotations from those heroes: Dr. King, Gandhi, Jesus Christ, Buddha, Krishna, the Dalai Lama and Lao-Tse.

Finally, Watson wrote:

> As an offer of good faith to serve my country and to honor the larger contract I entered into with the U.S. government in 1998, I would fulfill my active duty obligation attending to the care of medically underserved populations throughout this country as a civilian physician via the United States Department of Health and Human Services Public Health and Indian Health Services, the Department of Veterans Affairs Health System or other institutions charged with the medical care of non-active duty military, civilian U.S. citizens.

J.A. 191.

In addition to his written application, Watson submitted ten letters of support from family members and colleagues. Because these letters are also vital to our consideration of whether there was a basis in fact to support the DACORB's decision, we include relevant excerpts here.

George D. Watson, Timothy's father, who served in the United States Army Reserve from 1963-69, wrote that Timothy had always been

> a sincere and honest person . . . . However, his attitude toward the direction our country's foreign policy is taking and his concerns about war and life-taking have been growing more intense. He now has a greater interest in the sanctity of life and is more vehement in his positions.
> Timothy's decision has been a hard one to accept. My beliefs are not totally his

8

and his beliefs are not totally mine, but I want him to do what he feels is right. I believe in my son's honesty and sincerity and support him in whatever he deems correct.

J.A. 193.

Timothy's mother, Joyann Watson, wrote that she was "shocked, surprised, disappointed [and] devastatingly frightened" by her son's decision.

> I'm shocked to know my sons' objections are where they are now, after 9/11. I did not know he was marching for/or against anything in Washington, D.C. What I *do* know is this. I do know my son is an honest, and sincerely, thoughtful person. I have no doubt that his feelings about war are true . . . . And, when he said to me, this is his decision, there is no doubt in my mind that it *is true*.

J.A. 194-95.

Timothy's wife, Dr. Sharon E. Watson, explained

> My family has always welcomed the addition of my husband to the family. I know that they were happy with the idea of my marrying a good man, a future doctor nonetheless, but they also admired Timothy's position as a future military officer. My father is a proud Korean War veteran, who has fond memories and stories of his service in the Army. My father's brother served in Vietnam and my father's uncle is Eugene Carroll – former rear admiral of the Navy (retired, now deceased). Predictably, the topic of Timothy's commitment to the Army invariable comes up when we get together with my father and it is undeniable the excitement and pride that my father has had in regards to our family's military service. Needless to say, Timothy's decision has not been looked on favorably by our family.
>
> I know my husband regrets the tremendous moral conflict he is now confronted with, as we both had previously looked upon his military obligation with much excitement and pride. I also know that his conviction is strong, sincere, and deeply held, despite the unease this decision has meant for our interactions with our families and the potential for future complications it may mean for me and our son. . . .
>
> Timothy, I can assure you, did not reach the decision to apply for discharge as a conscientious objector quickly or lightly, but approached it like every other important decision in his life, with rigorous caution and careful, objective study. My husband, for better or worse, is an idealist who strives for perfection in practically everything he does. He, more than most, also sees the world as it should be and strives to be a positive force towards that goal. His decision to pursue conscientious objector status represents yet another example, albeit likely the most controversial and striking example, of his consistent unwillingness to participate with activities he deems improper, inaccurate or immoral.

9

. . . I have seen his beliefs about killing and warfare change, and I believe that he is at peace now with his decision. . . .

Our families' responses to Timothy's decision have been less than enthusiastic, to put it mildly. Still, Timothy will do what he believes he must, regardless of the consequences. That simply is the type of person that he is.

J.A. 196-97.

Watson also included letters from seven supervisors and colleagues. Dr. Ira L. Resnick wrote:

> While the majority of the staff tended to support the country's military positions following the 9/11 attacks, Tim questioned the motives and rationalizations of the government, particularly as pertaining to the war in Iraq. During these discussions over the course of the past several years, Tim has increasingly argued passionately against the single-minded use of force over diplomatic means to resolve our international disputes and the futility of war.

J.A. 198.

According to Dr. Peter Nardi,

> Tim is an intellectually deep thinker with strong moral convictions. . . . Over the years I have known him, we had many discussions about his military commitment. Applying for conscientious objector status is not an easy thing to do, and I know Tim has searched deep within himself before coming to this decision. As to the question of his sincerity let there be no doubt this is a quality he has plenty of.

J.A. 200.

In Dr. Robert F. Leonardo's view, Watson's decision to apply for conscientious objector status was not an easy one.

> [Tim's] military involvement would create a true moral and ethical struggle. In fact, the word struggle is especially appropriate because, for a long time, I believe Tim did try to figure out a way to fulfill his obligations while maintaining his moral sense of self. However, as time progressed, military actions and strategy, whether in Afghanistan or Iraq, have made this increasingly difficult and led to the conclusion that to become a conscientious objector was the only way to remain true to himself. . . . While this has created a considerable amount of psychological stress in the past as well as potential financial stress in the future, I feel it is the right decision for him based upon my personal knowledge of both Tim and his beliefs.

J.A. 201.

Dr. Belur S. Chandramouly wrote that Watson was "very concerned that America is changing into a country very different from the one he grew up and believes in," and "truly believes in peace, harmony and non violence for America and rest of the world." J.A. 202. Dr. Christopher Coppa commented that if he had to characterize Dr. Watson, he would call him "ethically and politically unwavering," "morally responsible," and "well-versed."

> [P]olitical discussions [about the aftermath of 9/11] run rampant amongst us as residents. At the center of many of these discussions is Dr. Watson. As long as I have known him, his response to U.S. military action post-9/11 has been fixed. He questions the utility of preemptive strikes as a mechanism for protecting a country, and deems the destruction and casualties resulting from war as morally detestable. Could the defense strategy of the U.S. following 9/11 have served as an impetus for, or contributed to, Dr. Watson's firm objection to participation in war? I definitely think so.

J.A. 203.

> Dr. Daniel Resnick wrote
>
> I have only known Timothy for 2.5 years; however, in that time I have witnessed his constant ruminations about the prospect of his responsibility to serve in the Military. I have witnessed some of his ethical struggle, which often seemed intense, as he strove to digest the ever-changing political climate and come up with an ethical framework for how he could serve in good conscience without betraying his sincere beliefs.
> . . . I am of the strongest opinion that his current desire to relieve himself of his Military responsibility is a deep felt ethically based decision that has been undertaken with the utmost sincerity. While it would be easier to fulfill his Military responsibility, I truly believe that Timothy's decision is based on his strong moral character which persuades him to follow what he believes is just, despite personal hardships.

J.A. 205-06.

> According to Mr. Joseph Columbo
>
> Dr. Watson says war that seeks to install democracy is as morally wrong as war to install communism. He believes such wars do not justify the loss of our soldiers, or the innocent lives taken by collateral damage. Dr. Watson deeply feels that the war in Iraq is an immoral response to the attacks of 911.

11

. . . .

. . . Dr. Watson cannot morally take part in this war because he believes all wars to be unnecessary.

. . . .

. . . [Dr. Watson] has clearly and constantly expressed deeply held moral beliefs against all war.

J.A. 208-10.

On July 6, 2006, pursuant to Army regulations, Watson was interviewed by a military chaplain and a psychiatrist. The chaplain indicated that he "might be convinced of [Watson's] sincerity and depth of conviction if his view on the sanctity of human life included being asked to be removed from an abortion procedure or if given other examples of how his position has affected other aspects of his life or medical decision."[2] J.A. 156.

The Army then appointed an investigating officer, Colonel Clinton R. O'Neill III. On July 12, 2006, Colonel O'Neill held an informal hearing at which Watson and his counsel were present. There is no transcript of the hearing,[3] but Colonel O'Neill prepared a written report summarizing Watson's testimony as follows:

Q:	Would you fight in any war in any form?
A:	No.
Q:	Would you abolish the Army?
A:	It is not my personal goal. However, the world would be better off without all

------

[2] Pursuant to Army Regulation 600-43, ¶ 2-3(h), no recommendation for approval or disapproval was made by the Chaplain.

[3] Pursuant to Army Regulation 600-43, ¶ 2-5(j), a verbatim record of the hearing is not required. "In the absence of a verbatim record, the investigating officer will summarize the testimony of witnesses. The investigating officer will permit the applicant or counsel to examine the summaries and note, for the record, the differences with the investigating officer's summary. Copies of statements and other documents received in evidence will be made a part of the hearing record. The investigating officer will authenticate the hearing record. The investigating officer's version is final as to the record of the testimony of the witnesses." *See also* Department of Defense Instruction ("DoDI") 1300.06 ¶ 7.4.2.4.

armies.

. . . .

Q:      What exactly are your beliefs?

A:      . . . . my beliefs . . . are that human life is a gift and we are charged with the responsibility of honoring that gift.  And to do so we must make every effort to ensure we save, protect, and uphold every human life.

. . . .

Q:      When did these beliefs become fixed in your mind, and you realized you were a [conscientious objector]?

A:      Sometime in late 2004 my beliefs became fixed when our efforts in Fallujah came to light and I had an increasing concern that our approach in Iraq and Afghanistan was unfounded.  I remember the picture of a soldier shooting an unarmed Iraqi at close range crying out.  This really shook me and prompted me to investigate what we were doing and what got us into this situation and quest.  My personal awakening of this and future missions peculated in early 2005, which led to on-line organizations that made more sense to me.  Sometime in the late or early summer of 2005, I was uncomfortable with our part in the current situation.  I discussed this with friends who were supportive and family members who were unhappy with this decision.  My friends suggested fraudulent approaches such as using homosexuality or using my position as a physician to process a disability to get out of the Army.  This made no sense.  I broke out my contract specifically . . . concerning resignation as a [conscientious objector]. . . .

. . . .

Q:      You have stated that the tragedy of Sept 11, 2001, and our government's response in Afghanistan and Iraq was a turning point for you . . . Yet it was in 2001 that you requested and received a medical residency deferment . . . and you did not submit your [application] until January 2006? Comment.

A:      . . . After September 2001, I had no qualms with Afghanistan but was a little uneasy with the pre-emptive strike against Iraq in 2003.  I did not have an epiphany at that time.

J.A. 149-51.

In addition, Watson delivered the following opening statement:

I am here today because of my belief in the sanctity of human life and the immorality of war.  These beliefs developed after entering into my contractual relationship with the US Army . . . .  Despite my patriotism, and perhaps because of it, my beliefs today are not compatible with the stated mission of the Army and I cannot in good faith and conscience participate in this institution of war.

My decision to pursue discharge from the military as a conscientious objector did not come to me in an epiphany, but grew from a intractable unease about our country's military response to September 11th 2001, and evolved into a relentless contempt and shame which has been continually fortified by the unending horrific results of this

13

country's latest military endeavor, our war on terror, our Iraqi freedom." J.A. 154.

By memorandum dated July 12, 2006, Colonel O'Neill recommended that Watson be classified as a conscientious objector and discharged from the Army "due to the extreme feelings and views he has expressed both in writing and verbally expressing his strong anti war bias, and refusal to treat combatant Soldiers." J.A. 147. According to Colonel O'Neill, after the tragedy of September 11, 2001 and the subsequent pre-emptive strikes in Afghanistan and Iraq, Watson had an "Epiphany" and reevaluated his life, beliefs and morals. Watson was "against the U.S. Army and all Armies," and was "sincere in his moral and ethical beliefs. All evidence gathered in the conduct of this investigation indicates that he is consistent in his beliefs and that he is deeply convicted as to how he feels and conducts himself from day to day." J.A. 147-48.

Through counsel, Watson submitted a response to Colonel O'Neill's report on July 18, 2006. The investigating officer's report and the entire case record was then forwarded through command channels for review and recommendations from four army officers. All four members of Watson's chain of command recommended disapproval of Watson's application. Collectively, six separate reasons were given for disapproval.[4] First, Watson submitted his application during the last year of his residency, as his active duty date was approaching. Second, Watson's moral rationale for conscientious objection was vague and insincere, and more of a general personal philosophy than a code by which Watson lived his life. Third, Watson's assertion that he would not treat soldiers wounded in battle contradicted both his claim that he

_____

[4] Some of the reasons were relied upon by all four officers, whereas others were relied upon by only one or two officers.

14

deeply believed in the sanctity of human life and the Hippocratic Oath. Fourth, Watson did not demonstrate that his beliefs governed his actions in word and deed. Fifth, Watson's primary or true opposition was to the wars in Iraq and Afghanistan and our nation's current policy. And sixth, Watson's application was well counseled and well written and closely traced the language of prior conscientious objector opinions.

On October 26, 2006, Watson submitted a rebuttal to these adverse recommendations. The entire package was then forwarded to the DACORB, the sole decision-making authority for applicants requesting discharge as conscientious objectors. *See* Army Reg. 600-43, ¶ 2-8a. On December 5, 2006, by a 2-1 vote, the DACORB denied Watson's application in a one-page memorandum, explaining:

> After thorough examination of the Case Record, the DACORB determined that the applicant did not present convincing evidence . . . that the applicant's stated beliefs warrant award of [conscientious objector] status. CPT Watson's application is disapproved. Specifically, the board opined that:
> •     DACORB Staff Judge Advocate--Recommend Disapproval
>   •     The applicant failed to demonstrate by clear and convincing evidence that he has a firm, fixed and sincere objection to participation in war in any form.
> •     DACORB Staff Chaplain--Recommend Approval
>   •     I believe CPT Watson's beliefs to be sincere and fixed. I recommend approval of his request, although, he should be required to repay all monies given him as part of his scholarship program.
> •     DACORB President--Recommend Disapproval
>   •     The application is not convincing. I am not drawn to believe in the applicant's sincerity and find him to be disingenuous and the application expedient.

J.A. 112. The DACORB offered no additional reasons for denying Watson's application.

On January 17, 2007, the Army ordered Watson to report for active duty to Winn Army Community Hospital, a Department of Defense medical facility located at Fort Stewart in Hinesville, Georgia. On January 24, 2007, Watson filed a petition for a writ of habeas corpus in

15

the Eastern District of New York.

By Opinion and Order dated April 10, 2007, the district court granted the petition. The district court held that the DACORB's denial of Watson's application did not satisfy the requirement that the reasons for disapproval be stated on the record. The district court then held, in the alternative, that even if it were to accept the Army's argument that the reasons stated by the DACORB were adequate because of the explanations contained in the chain of command recommendations, those recommendations revealed no basis in fact for the DACORB's denial of Watson's application. Because there was no basis in fact to support the DACORB's denial of Watson's application, the district court held that remand to the DACORB for an adequate statement of reasons was unnecessary and granted the writ.

## DISCUSSION

We review a district court's grant of habeas relief *de novo*. *Hemstreet v. Greiner,* 491 F.3d 84, 89 (2d Cir. 2007). Where an enlisted army officer applies for discharge as a conscientious objector and his application is denied, he may petition for a writ of habeas corpus to obtain review of the decision. *Hammond v. Lenfest,* 398 F.2d 705, 712 (2d Cir. 1968). Review is limited to whether there is a "basis in fact" to support the military's decision. *United States ex rel. Foster v. Schlesinger*, 520 F.2d 751, 755 (2d Cir. 1975).

I.      **Remand to the DACORB For a Statement of Reasons**

Discharge of a voluntary enlistee for conscientious objection is a privilege granted by the executive branch, not a constitutional right. *Nurnberg v. Froehlke*, 489 F.2d 843, 849 (2d Cir. 1973). Army regulations provide that the DACORB is the final decision maker on all applications requesting discharge as a conscientious objector. *See* Army Reg. 600-43, ¶ 2-8a.

16

Pursuant to regulation, before the DACORB forwards a case in which it recommends disapproval to Army Headquarters, the DACORB must furnish the applicant with "a copy of the disapproval recommendation and the supporting reasons." *Id.* ¶ 2-8d(1); *see also id.* ¶ 2-8d(3) ("If a determination by [Army Headquarters] that the person's request is disapproved [sic], the reasons for this decision will be made a part of the record. It will be provided to the person through command channels.").

> In *United States ex rel. Checkman v. Laird*, 469 F.2d 773 (2d Cir. 1972), we held that
>
> When there is a requirement of law that reasons be stated by executive officials or administrative agencies responsible for decisions, there is an implicit corollary that the decision must stand or fall on the basis of the reasons stated. This is a general doctrine of administrative law. . . . Otherwise a court, if it sustains a decision by recourse to reasons outside those specified, opens the door to an improper substituting of the court's judgment and evaluation of evidence in place of that of the agency (here the [DACORB]) . . . with responsibility. The court's judgment, its reasons and approaches, may not be acceptable to and may even have been discredited by the administrative officials responsible.

*Id.* at 780-81 (internal citations and quotations marks omitted). We recognized in *Checkman* that it "is not the function of [a] court to search the record for some basis to affirm the Army's decision when the reasons given therefor are inadequate." *Id.* at 780 n.10 (internal quotations marks omitted). The requirement that the DACORB provide a statement of reasons for its decision is not satisfied by "mere conclusory statements of insincerity," *United States v. Stewart*, 478 F.2d 106, 113 (2d Cir. 1973), or by "a bare recitation . . . of the ultimate statutory criteria," *Checkman*, 469 F.2d at 787. Instead, "[t]he facts or factors relied upon by the board must be stated." *Stewart*, 478 F.2d at 113; *see also Checkman*, 469 F.2d at 781 (The DACORB must "identify, and be reviewed on the basis of the identification of, the salient underlying considerations and type of evidence relied on, for example letters from associates, reports of

17

personal demeanor, and lateness in filing an application.").

On appeal, the Army does not challenge the district court's determination that the DACORB's statement of reasons for denying Watson's application for discharge were deficient as a matter of law. Instead, it argues that the district court erred in "conduct[ing] its own independent review of the record to determine what conclusion, in the court's view, should be drawn from the evidence" rather than remanding to the DACORB to provide an adequate statement of reasons. *See* Appellant's Br. 13.

When an agency has provided an insufficient explanation for its decision, "the appropriate course for a reviewing court ordinarily is to remand the case to the agency." *Ward v. Brown*, 22 F.3d 516, 522 (2d Cir. 1994); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. . . . [There is] an important corollary of the foregoing rule. If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.").

Thus, in the ordinary course, where the DACORB has failed to provide an adequate statement of reasons to explain its decision, the district court should remand to the DACORB for

a sufficient statement of reasons. *See United States ex rel. Coates v. Laird*, 494 F.2d 709, 712 (4th Cir. 1974). However, remand to the DACORB is not necessary if remand would be futile. *See, e.g., Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 630 (2d Cir. 2008) (plaintiffs not entitled to administrative remand where remand would be futile). If there is no basis in fact to support the DACORB's decision that Watson did not show, by clear and convincing evidence, a firm, fixed and sincere objection to participation in war in any form by reason of religious training or belief, then remand would be futile, and is thus not required. *See Coates*, 494 F.2d at 712 (remand is proper unless the record shows there is no basis in fact for denial of the application on any valid ground); *see also George Hyman Constr. Co. v. Brooks*, 963 F.2d 1532, 1539 (D.C. Cir. 1992) (remand to the agency for further statement of reasons would be futile where "only one disposition is possible as a matter of law").

The Army conceded as much at oral argument. Oral Argument Tr. 8-9. To the extent that the Army argues that the futility inquiry "would require a court, as a matter of course, to substitute its own independent weighing of the evidence before remanding the matter to the agency for its assessment," and therefore is "incompatible with the ordinary remand rule and basic principles of administrative law," *see* Appellant's Br. 23 n.10, we respectfully disagree. Allowing the district court to review the record to determine whether there is a basis in fact for the DACORB's denial of a conscientious objector application would not require the court to substitute its own independent weighing of the evidence on a question the agency has not reached.[5] First, the DACORB has reached the question once it has denied the application. The

_____

[5] The Army's reliance on *INS v. Ventura,* 537 U.S. 12 (2002), and *Gonzales v. Thomas*, 547 U.S. 183 (2006), is similarly misplaced. In *INS v. Ventura*, the BIA determined that any persecution the petitioner faced in Guatemala was not on account of political opinion. The Ninth

19

agency has determined that the applicant has not established, by clear and convincing evidence, that he has a firm, fixed and sincere objection to participation in war in any form by reason of religious training and belief, albeit without sufficiently stating its reasons for that conclusion. Second, the district court does not independently weigh any evidence. Rather, it merely determines if there was *any* objective evidence to support the DACORB's determination. Indeed, in this case, despite the Army's vigorous protestations to the contrary, the district court did not conduct its own independent review of the record to determine whether it believed that Watson's application should have been granted or denied in the first instance. Instead, based on the Army's own argument before the district court that the DACORB's rationale was readily discernible in the chain of command recommendations, the district court examined each and every reason stated and found that there was no objective fact to support denial of the application on any valid ground.

Therefore, we hold that where the DACORB does not provide an adequate statement of the reasons for its denial of a conscientious objector application, a district court must remand to the Army for a statement of reasons unless remand is plainly futile, for example, when the record reveals there is no basis in fact to support the denial on any valid ground.

## II. Whether There Was a Basis in Fact for the DACORB's Decision

We now consider whether the district court erred in holding that there was no basis in fact

---

Circuit reversed. It then went on to decide an issue that the BIA had not considered -- whether country conditions in Guatemala had changed. 537 U.S. at 13-14. The Supreme Court reversed, holding that the question was for the BIA to consider in the first instance. *Id.* at 17. In this case, there is no question that the DACORB did not address in the first instance and that the district court reached out to decide. Instead, the DACORB plainly denied Watson's application for conscientious objector status and the district court then reviewed the record to determine whether there was a basis in fact for that decision.

to support the DACORB's decision in this case.

A.    Regulatory Framework

Army regulation defines conscientious objection as "[a] firm, fixed and sincere objection to participation in war in any form or the bearing of arms, because of religious training and belief" and defines religious training and belief to include "deeply held moral or ethical belief[s]" even if the applicant himself characterizes them as non-religious.  Army Reg. 600-43, Glossary, Section II, Terms; *see also Gillette v. United States*, 401 U.S. 437, 443 (1971) (objection must be to participation in war in any form); *Welsh v. United States*, 398 U.S. 333, 343-44 (1970) (objection must be based on "religious training and belief," including beliefs that are ethically or morally derived); *Witmer v. United States*, 348 U.S. 375, 381-82 (1955) (objection must be sincere).  Religious training and belief does not encompass "a belief that rests solely upon consideration of policy, pragmatism, expediency, or political views."  Army Reg. 600-43, Glossary, Section II, Terms.  Further, "[a] person who desires to choose the war in which he or she will participate is not a conscientious objector under the regulation.  His or her objection must be to all wars rather than a specific war."  *Id.*

The burden of establishing a claim of conscientious objection is on the applicant, who must establish that he falls within the regulatory criteria discussed above by clear and convincing evidence.  Army Reg. 600-43, ¶ 1-5c.  Relevant factors include "whether ethical or moral convictions were gained through training, study, contemplation, or other activity comparable in rigor and dedication to the processes by which traditional religious convictions are formulated."  *Id.* ¶ 1-5a(5)(b).

B.    Basis in Fact Standard

Pursuant to Department of Defense regulation, discharge for conscientious objection is "discretionary with the Military Department concerned, based on a judgment of the facts and circumstances in the case." Department of Defense Instruction ¶ 4.1. The final determination is subject to limited review in federal court for whether there is a "basis in fact" to support the military's decision. *Foster*, 520 F.2d at 755.

"The basis in fact test is satisfied if there is objective evidence, even though not preponderant or substantial, to support the finding in question." *Id.* (internal quotation marks omitted). The standard of review is thus "severely limited," *Hammond*, 398 F.2d at 716, and has been called the "narrowest [review] known to the law," *United States v. Corliss*, 280 F.2d 808, 810 (2d Cir. 1960). In determining whether there is a basis in fact to support a decision, we do not substitute our own judgment for that of the military, and do not weigh the evidence to determine whether the decision was justified. *See Aguayo v. Harvey*, 476 F.3d 971, 977-78 (D.C. Cir. 2007); *Estep v. United States*, 327 U.S. 114, 122-23 (1946). Instead, the military's decision, made in conformity with the regulations, is "final even though [it] may be erroneous." *Estep*, 327 U.S. at 122.

Nonetheless, as the First Circuit recently explained:

[a]lthough this standard of review is a narrow one, it is not toothless. A basis in fact will not find support in mere disbelief or surmise as to the applicant's motivation. Rather, the government must show some hard, reliable, provable facts which would provide a basis for disbelieving the applicant's sincerity, or it must show something concrete in the record which substantially blurs the picture painted by the applicant. The DACORB's reasons for its decision must be grounded in logic and a mere suspicion is an inadequate basis in fact.

*Hanna v. Sec'y of the Army*, 513 F.3d 4, 12 (1st Cir. 2008) (internal quotation marks and citations omitted). This comports with our decision in *Checkman*, where we held that the

DACORB must "predicate any finding of insincerity upon objective evidence affording a rational basis for the Board's refusal to accept the validity of the applicant's claims. . . . What is required is the kind of evidence that substantially blurs the picture painted by the applicant." 469 F.2d at 778 (internal quotation marks and brackets omitted). While the evidence in the record, "need not be as comprehensive as substantial evidence, . . . it cannot be a mere scintilla." *Id.* at 787 (internal quotation marks omitted).

Finally, the requirement that there be a "basis in fact" in objective evidence to support the DACORB's decision "is one that is satisfied whether or not that basis is set forth in the formal opinion of the [DACORB], so long as it appears in the record." *Id.*

### C. Application of the Basis in Fact Standard to this Case

On appeal, the Army argues that there are four bases in fact to support the denial of Watson's application.[6] First, the timing of Watson's application, as his residency was ending and active duty was approaching, "indicates that his professed belief was merely expedient, rather than sincerely held." Appellant's Br. 30. Second, the application and supporting materials make clear that Watson does not truly oppose war in all forms, but is specifically opposed to the wars in Iraq and Afghanistan. Third, Watson's application "explains the development of [his] conscientious objection by what can reasonably be characterized as a grab-bag of references to various political and religious figures." Appellant's Br. 37. Fourth, Watson purportedly delayed between the time his conscientious objector views crystallized in the early summer of 2005 and

---

[6] The Army explicitly abandons others reasons suggested by the officers in Watson's chain of command and by the Chaplain who interviewed Watson in this case. However, because remand to the DACORB for an adequate statement of reasons would not be futile if there was any basis in fact that appeared in the record, in the interest of thoroughness, we address these possible reasons on the merits below.

the time his application for discharge as a conscientious objector was initially filed, in January 2006.[7]

As to the timing of Dr. Watson's application, when he submitted his application for discharge as a conscientious objector, Watson was in the last year of his residency, but had not yet received orders to report for active duty. Moreover, the timing of an application alone is never a sufficient ground for disapproval of an application. Army Reg. 600-43, ¶ 1-5a(5)(c); *see also Ferrand v. Seamans*, 488 F.2d 1386, 1390 (2d Cir. 1973).

As to Watson's true opposition being to the wars in Iraq and Afghanistan and our current national policy rather than to war in any form, the Army officers in Watson's chain of command pointed to Watson's written application, his testimony and opening statement before Colonel O'Neill, and the ten letters submitted on his behalf. Two officers also focused on the fact that the peace march in Washington D.C. in which Watson participated was "specifically focused on opposition to the war in Iraq as opposed to all wars." J.A. 139; *see also* Appellant's Br. 31-37.

Pursuant to Army regulation, "[a] person who desires to choose the war in which he or she will participate is not a conscientious objector under the regulation. His or her objection must be to all wars rather than a specific war." Army Reg. 600-43, Glossary, Section II, Terms. Watson's written application and the ten supporting letters submitted on his behalf indicate that September 11, 2001, and America's subsequent wars in Afghanistan and Iraq, were for Watson profound catalysts for introspection and radical turning points in his life, which caused him to reconsider his views on life, God, and religion, and come to conscientious objection. The

---

[7] This was first suggested as a possible basis in fact at oral argument. Therefore, it was arguably waived. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 300 (2d Cir. 2006). However, for the reasons stated in footnote 6, *supra*, we address this basis on the merits below.

application and supporting letters do not provide any objective support for the view that Watson's introspection led him only to oppose the wars in Iraq and Afghanistan. Neither does the fact that Watson marched, in September 2005, to stop the war in Iraq. Opposing the war in Iraq is obviously not inconsistent with opposing all war. *See, e.g.*, *United States ex. rel. Lehman v. Laird*, 430 F.2d 96, 99 (4th Cir. 1970); *see also* Army Reg. 600-43, ¶ 1-5a(3) ("Applicants who are otherwise eligible for conscientious objector status may not be denied that status simply because of their views on the nation's domestic or foreign policies.").

Finally, Watson's testimony before Colonel O'Neill does not substantially blur the picture painted by Watson, that his discomfort with our country's policies in Iraq and Afghanistan was a profound catalyst for introspection that led him to oppose all violence and war. Indeed, after conducting the hearing, Colonel O'Neill concluded that after the tragedy of September 11, 2001, and our military strikes in Afghanistan and Iraq, Watson had an epiphany, reevaluated his life, his beliefs, and his morals, and became opposed to all armies. "[G]reat weight must be accorded to favorable observations and recommendations of sincerity submitted by officers who have, pursuant to regulation, personally interviewed a conscientious objector applicant." *Ferrand*, 488 F.2d at 1390. Therefore, Watson's testimony at the hearing before Colonel O'Neill does not constitute "objective evidence affording a rational basis for the [DACORB's] refusal to accept the validity of [Watson's] claims." *Checkman*, 469 F.2d at 778.

As to the "grab-bag" argument, according to the Army, Watson's application:

is punctuated throughout by block quotes from various figures that seem to have little or no relevance to the subject of the application. Watson's "kitchen sink" approach creates the appearance that he appealed to a smorgasbord of sources in the hopes that at least one of his claimed sources of inspiration would find resonance with the Board.

Appellant's Br. 37-38. Any fair reading of the application does not support this view. In

response to a question on the application form asking for what sources and training had caused the development of Watson's conscientious objector beliefs, Watson cited to or quoted from Dr. King, Gandhi, the Dalai Lama, the Christian Bible, the Qur'an, Hinduism, Islam, Buddha, Confucius and Lao-Tse. These quotations were relevant to the question at hand. Then, in response to a question regarding how his future plans had changed as a result of his beliefs, Watson stated that he would strive to teach his son religious tolerance, and would expose his son, at an early age, to the "heroes" it had taken him his entire life to discover. Watson then quoted from those heroes: Dr. King, Gandhi, Jesus Christ, Buddha, Krishna, the Dalai Lama and Lao-Tse. This does not constitute a basis in fact for denying his application.

As to Watson's purported delay between the time his conscientious objector views crystallized in the early summer of 2005 and the time his application for discharge was initially filed, in January 2006, this is not an objective fact to support the DACORB's denial. Army Regulation 600-43 instructs the investigating officer to "[q]uestion the sincerity of the applicant if an applicant has delayed *for a significant period of time* after the crystallization of his or her beliefs to submit an application." Army Reg. 600-43, Appendix D-2(i) (emphasis added). The six month period between the summer of 2005 and January 2006 is not a significant period of time when the breadth and depth of the required application for discharge is taken into account.

The regulations also provide: "[i]f it appears . . . that the applicant delayed his or her application to complete a Government–sponsored educational program, this delay may be grounds for questioning his sincerity." *Id.* Appendix D-2(h); *see also United States ex rel. Donham v. Resor*, 436 F.2d 751, 754 (2d Cir. 1971) (finding a basis in fact for denial of conscientious objector application where the applicant, a student at West Point, waited until after

26

final examinations to file his application, even though he admitted that his beliefs against war had crystallized several months earlier, because he feared that if he submitted his application during the semester he would not be permitted to finish the school year, as during that time "he continued to serve in an establishment and learn and teach things he then claimed to find intolerable as a matter of conscience and basic conviction."). In this case, Watson was not participating in any Government sponsored educational program and certainly did not fear that he would be removed from his civilian residency program if he filed an application for discharge from the Army as a conscientious objector. Moreover, during the fall of 2005 Watson did not serve in any establishment that he later "claimed to find intolerable as a matter of conscience." *Donham*, 436 F.2d at 754. Therefore, any purported delay during the fall of 2005 does not constitute a concrete fact for disbelieving Watson's sincerity.

We now consider whether the remaining reasons and facts suggested by the Army officers in Watson's chain of command and by the military Chaplain who interviewed Watson, but abandoned by the Army on appeal before this Court, can constitute a basis in fact for denial of Watson's application: (1) Watson's assertion that he would not treat soldiers wounded in battle contradicted his claim that he deeply believed in the sanctity of human life and the Hippocratic Oath; (2) Watson did not demonstrate that his beliefs governed his actions in word and deed; (3) Watson's application was well counseled and well written and closely traced the language of prior conscientious objector opinions; (4) Watson never asked to be removed from an abortion procedure.

First, Watson's assertion that he would not treat soldiers wounded in battle did not contradict either his belief in the sanctity of human life or the Hippocratic Oath. Watson did not

say that he believed that soldiers wounded in battle should not be treated or should be left to die, only that he would leave the task of treating them to someone who was not opposed to war in any form. Therefore, this assertion does not constitute a basis in fact for denial of Watson's application.

Second, in his written application, Watson explained that as a result of his beliefs he had become more introspective, curious, questioning and resolute; set aside time each day for reflection; participated in a peace march in Washington D.C.; joined Physicians for Social Responsibility; and decided to pursue a career in oncology imaging and intervention. He also wrote that he would strive to teach his son religious tolerance and to introduce his son, while he was still a child, to the thinkers that had such an enormous impact on Watson's own life. None of this constitutes evidence affording a rational basis for the Army to refuse to accept Watson's claimed beliefs.

Third, the fact that Watson's application was "well-counseled" is not an objective basis for disbelieving his sincerity. "An applicant . . . is clearly entitled to be represented by counsel in [conscientious objector] proceedings, and . . . it is impermissible to allow any negative inference about an applicant's sincerity to be drawn from his attempts to procure legal advice from whatever source." *Goldstein v. Middendorf*, 535 F.2d 1339, 1344 (1st Cir. 1976) (citation omitted).

Finally, as to the Chaplain's suggestion that he would have been inclined to believe in Watson's sincerity had Watson asked to be removed from an abortion procedure, it is undisputed that the Chaplain never actually asked Watson about his views on abortion.

The record contains no basis in fact to support the denial of Watson's application for discharge as a conscientious objector. Therefore, we hold that remand to the DACORB for an adequate statement of reasons would be futile.

## CONCLUSION

Where the DACORB does not provide an adequate statement of the reasons for its denial of a conscientious objector application, a district court must remand to the Army for an adequate statement of reasons unless such remand would be utterly futile, as when the record reveals there is no possible basis in fact to support the decision. Because in this case the record contains no basis in fact for denial of the application on any valid ground, we affirm the judgment of the district court.